WMN
F#2009R00518

M-10-071

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

HENRI AL HALABI,
    also known as "Isaac,"

        Defendant.

- - - - - - - - - - - - - - - - -X

**FILED UNDER SEAL**
C O M P L A I N T

(18 U.S.C. § 2320)

EASTERN DISTRICT OF NEW YORK, SS:

    GEORGE R. KELLER, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, in or about and between May 2009 and January 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant HENRI AL HALABI, also known as "Isaac," together with others, did knowingly and intentionally traffic in goods and knowingly used a counterfeit mark on or in connection with such goods.

    (Title 18, United States Code, Section 2320)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with the FBI for almost two years. Prior to joining the FBI, I worked as a New York City Police Department ("NYPD") patrolman and sergeant for approximately 10 years. During my tenure with the FBI and NYPD, I have participated in numerous counterfeit clothing investigations, among others, during the course of which I have (a) conducted surveillance of individuals engaged in counterfeit clothing trafficking and money laundering; (b) executed search warrants at locations where counterfeit clothing, illegal proceeds and records of counterfeit clothing and money laundering transactions have been found; (c) reviewed and analyzed numerous taped conversations and records; and (d) debriefed cooperating witnesses. In particular, during my tenure with NYPD, I participated in numerous counterfeit merchandise investigations and in fact was specially trained for such investigations. My information in this case comes from a review of records, meetings with other law enforcement officers, including members of the NYPD, and my direct participation in the investigation.

---

[1] Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

### Evidence Gathered Through a Cooperating Witness

2.  In or about mid-2009, law enforcement officers arrested an individual (hereinafter "CW") who later pled guilty, pursuant to a cooperation agreement, to trafficking in counterfeit clothing, in violation of 18 U.S.C. § 2320. As part of CW's cooperation, CW attended several meetings with law enforcement, during which time CW provided information that was later corroborated by independent evidence.

3.  Notably, prior to CW's arrest, law enforcement agents seized a large amount of counterfeit clothing. During meeting with law enforcement, CW stated, in sum and in substance, that some of the counterfeit clothing seized was obtained from an individual known as "Isaac." CW further stated, in sum and in substance, that "Isaac" was a regular supplier of counterfeit clothing and that "Isaac" knew he was selling counterfeit clothing.[2/] CW also provided several telephone numbers for "Isaac" and provided the address, as well as a description, of the location where "Isaac" worked.

4.  Based on bank records discussed below, agents were able to obtain of photograph of an individual who they believed could be "Isaac." In late 2009, agents showed that photograph to

---

[2/] This statement that HENRI AL HALABI, also known as "Isaac," knew he was selling counterfeit clothing is corroborated by, among other things, a recorded conversation from a meeting between him and CW, as discussed below.

CW and CW identified the individual in that photograph as "Isaac."[3/] Thus, agents learned that "Isaac's" true identity was HENRI AL HALABI.

5.  CW stated, in sum and in substance, that he/she often dealt with "Isaac" for the purchase of counterfeit clothing. A recorded telephone call, at the direction of FBI agents, by CW to "Isaac" confirmed that information. During the recorded call, HENRI AL HALABI, also known as "Isaac," spoke with CW about clothing transactions and did so in a manner that indicated that he was very familiar with CW.

6.  Within the past several months, at the direction of FBI agents, CW met with HENRI AL HALABI, also known as "Isaac," to discuss a debt owed by CW to AL HALABI arising out of a past counterfeit clothing transaction. This meeting was observed by an FBI agent. In addition, the meeting was recorded with a device in CW's possession that was provided by FBI agents. At the meeting, CW told AL HALABI, in sum and in substance, that clothing provided by him had been seized by police and CW wanted to purchase additional clothing from him. AL HALABI responded, in sum and in substance, that he did not have clothing available

---

[3/]  During meetings with agents, CW provided information about approximately 15 individuals alleged to be involved in the trafficking of counterfeit clothing. Thus, presenting CW with just one photograph, as opposed to a photographic array, did not suggest to CW the agents' beliefs as to who was depicted in that photograph.

4

at present but was expecting to obtain additional clothing at a later date. In explaining why he presently did not have clothing, AL HALABI commiserated with CW, stating, in sum and in substance, that he too had clothing seized by police. Thus, AL HALABI corroborated CW's information that AL HALABI was aware that he was selling counterfeit clothing.

### Evidence Gathered Through Bank Records

7. Further evidence that HENRI AL HALABI, also known as "Isaac," is knowingly trafficking in counterfeit goods is found in bank records for an account to which he is the sole signatory and that he regularly uses. The account is in the name of "Zoom Denim," though that purported business does not appear to have a physical location, and it is not the name of the clothing establishment at which AL HALABI works.[4]

8. Based on my training and experience, I know that counterfeit traffickers amass large amounts of cash proceeds from the sale of counterfeit goods in the United States. The traffickers, or those associated with the traffickers, frequently attempt to give the impression of legitimacy to these profits; i.e., to "launder" them by making the profits appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those proceeds to suppliers of

---

[4]   The bank account lists AL HALABI's home address as the purported location of the business.

counterfeit goods, without alerting governmental or law enforcement agencies. In order to accomplish this goal, traffickers frequently utilize banks and financial institutions in order both to make their counterfeiting profits appear to be from legitimate sources and to move those profits through the financial system to higher level members of the counterfeiting organization. These efforts frequently utilize third-party individuals that purport to have legitimate earnings, but which in actuality have little or no such sources of income.

9. Based on my training and experience, I know that the first step in laundering or transporting proceeds from the sales of counterfeit goods is to deposit them in a bank or financial institution. Once the proceeds are in a financial institution, they are more easily laundered and transported. However, the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313, et seq., also known as the Bank Secrecy Act, is designed to combat this type of money laundering, in part by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency. Specifically, 31 U.S.C. § 5313(a) and its related regulations provide that when a domestic financial institution, including banks and money service businesses, is involved in a transaction for the payment, receipt, or transfer of U.S. currency in an amount greater than $10,000, the institution shall file a

currency transaction report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution. CTRs are filed with the Financial Crimes Enforcement Network at the Detroit Data Center on forms that require disclosure of, among other information, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed. These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are conducted by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any single business day.

     10. Based on my training and experience, I know that many individuals involved in illegal activities, such as counterfeit trafficking and money laundering, are aware of the reporting requirements and take active steps to cause financial institutions to fail to file CTRs in order to avoid detection of the movement of large amounts of cash. These active steps are often referred to as "structuring" and involve making multiple cash deposits or withdrawals in amounts less than $10,000 on the same day or consecutive days in order to avoid the filing of

CTRs. Such structuring activity, which itself is illegal,[5] can frequently occur with deposits made into the same bank account at multiple branch locations, at the direction of the counterfeit trafficker or other launderer of illicit funds, in order to avoid the aggregation of large amounts of cash proceeds at a central location. Sometimes these deposits are followed by corresponding payments made by check, ATM withdrawls, or electronic funds transfers. In these circumstances, the bank account serves as a "pass-through" designed to facilitate the laundering and transmission of illegal proceeds back to counterfeiters in order to avoid detection by law enforcement authorities. Based upon my training and experience, the use of a "pass-through" account in this fashion is consistent with the transmission and laundering of counterfeiting proceeds.

11. According to records for that Zoom Denim bank account controlled by HENRI AL HALABI, from March 20, 2009 to December 15, 2009, roughly thirty-eight structured currency deposits were made into the account totaling approximately

---

[5]  Structuring is prohibited by 31 U.S.C. § 5324(a)(3). Specifically, pursuant to 31 U.S.C. § 5324, it is a crime for an individual to (a) "cause or attempt to cause a domestic financial institution to fail to file a report required under § 5313(a)," (b) "cause or attempt to cause a domestic financial institution to file a report required under § 5313(a) that contains a material omission or misstatement of fact," or (c) "structure or assist in structuring, any transaction with one or more domestic financial institutions" for the purpose of evading the reporting requirements of 31 U.S.C. § 5313(a).

$177,992.00. None of the individual deposits exceeded $10,000, and many of the deposits were around $8,000 or were made on consecutive days. For example, beginning on September 8, 2009 through and including October 29, 2009, twenty-two individual cash deposits, totaling $108,774.00 in the aggregate, were made into the bank account. The chart below sets forth the dates and amounts of the cash deposits during this period. In addition, on or about September 8, 2009, September 9, 2009, October 5, 2009, October 9, 2009, and October 24 through 26, 2009, multiple deposits were made on the same banking day each in amounts of less than $10,000.00, but which exceeded $10,000.00 in the aggregate, which triggered the filing of "multiple transaction" CTRs by the bank.[6/] The dates of those deposits are reflected with an asterisk (*).

| Date of Deposit | Amount Deposited |
|---|---|
| 9/08/2009* | $3,000.00 |
| 9/08/2009* | $8,800.00 |
| 9/09/2009* | $4,000.00 |
| 9/09/2009* | $8,000.00 |
| 9/09/2009* | $1,836.00 |
| 10/01/2009 | $3,000.00 |
| 10/02/2009 | $3,000.00 |
| 10/05/2009* | $4,410.00 |
| 10/05/2009* | $2,000.00 |

---

[6/]   A "multiple transaction" CTR is typically filed by a financial institution without the customer's knowledge when the customer conducts more than one cash deposit or withdrawal transaction on the same banking day and the aggregate of such deposits or withdrawals exceeds the amount of $10,000.

| Date of Deposit | Amount Deposited |
|---|---|
| 10/05/2009* | $8,500.00 |
| 10/08/2009 | $3,528.00 |
| 10/09/2009* | $8,000.00 |
| 10/09/2009* | $2,000.00 |
| 10/09/2009* | $4,600.00 |
| 10/12/2009 | $5,000.00 |
| 10/16/2009 | $8,000.00 |
| 10/20/2009 | $8,000.00 |
| 10/22/2009 | $2,000.00 |
| 10/24/2009* | $6,000.00 |
| 10/26/2009* | $2,000.00 |
| 10/26/2009* | $5,000.00 |
| 10/29/2009 | $8,100.00 |

Thus, based on my experience, training and knowledge of this investigation, I believe that HENRI AL HALABI, also known as "Isaac," utilizes an account in which money is deposited in a way that is meant to conceal its movement because that money is the proceeds of illegal activity and he is trying to conceal his involvement in that illegal activity.

    12. Furthermore, account records show that the account is being used as a "pass-through" account - in other words, large amounts of money are quickly deposited into the account and just as quickly withdrawn or moved to other accounts. For example, in the short span between September and November 2009, approximately $2 million was deposited into the account and approximately $2 million left the account. However, the highest balance in the account at any one time was only approximately $350,000.00. In addition, a recent Dun & Bradstreet report estimates that Zoom

Denim has annual sales of $170,000, which low number is inconsistent with the high amount of money passing through that bank account. Thus, based on my experience, training and knowledge of this investigation, I believe that HENRI AL HALABI, also known as "Isaac," utilizes an account through which money is moved quickly because that money is the proceeds of illegal activity and, as such, needs to be moved quickly to avoid both arousing suspicion and seizure by law enforcement.

WHEREFORE, your deponent respectfully requests that the defendant HENRI AL HALABI, also known as "Isaac," be dealt with according to law.

GEORGE R. KELLER
Special Agent,
Federal Bureau of Investigation

Sworn to before me this
21 Day of January, 2010

S/ Mann

UN .TE JUDGE
E :W YORK

11